Filed 8/4/23  P. v. Romain CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B301447 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA257828) |
| v. | |
| PIERRE ALPHONSE ROMAIN, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed on July 17, 2023, be modified as follows:

In footnote 16 on page 20, "Senate Bill Nos. 1473" is deleted and replaced with "Senate Bill Nos. 1437".

The petition for rehearing is denied.  There is no change in judgment.

_____

BAKER, Acting P. J.          MOOR, J.          KIM, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B301447 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA257828) |
| v. | |
| PIERRE ALPHONSE ROMAIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry Fidler, Judge.  Affirmed.

Law Offices of E. Thomas Dunn, Jr. and Edward Thomas Dunn, Jr. for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Paul M. Roadarmel, Jr., Supervising Deputy Attorneys General, for Plaintiff and Respondent.

Jade Clark (Clark) was killed in 1987 when he was the victim of an attempted carjacking that resulted in a gunfight. Defendant and appellant Pierre Romain (defendant) was arrested and charged with murder shortly after the crime, but the charge was dismissed and the case went cold for many years. Later advances in DNA analysis, however, provided evidence that was not available at the time of the murder: defendant's DNA found on clothing fibers and a speck of human tissue that were stuck to an expended bullet recovered at the crime scene. Defendant was again charged with murdering Clark and a trial jury found him guilty. In this appeal from the conviction, we are asked to decide, in the main, whether various evidentiary rulings by the trial court were correct and whether defendant's trial attorney was constitutionally ineffective.

I

A

In the very early morning hours of June 29, 1987, Clark and an acquaintance Clifford Phillips (Phillips) were driving around Los Angeles "hang[ing] out." Clark was the driver, and he was driving his customized convertible Nissan 300ZX that Phillips described as a "flashy car." Clark was wearing a red sweatshirt.

Around 2:00 a.m. that morning, Clark and Phillips arrived outside a nightclub called the Danceteria on Highland Avenue. They parked across the street and did not go inside; according to Phillips, they were waiting in the car to meet friends and "girls."

As Clark and Phillips waited in the car, a man opened the door on Clark's side of the car, pointed a gun at Clark, and repeatedly told Clark to "get the fuck out." Phillips could not see

2

the face of the man accosting Clark, but he did see Clark pull a gun of his own, which Clark pointed at his assailant and held "low" close to the floor of the car. Clark's attacker began to use his free arm (i.e., the one not holding the gun) to try to pull Clark out of the car, and a tug-of-war ensued with Clark trying to stay in the car and the assailant trying to pull Clark out.

Meanwhile, another man (later identified as Duane Dixon) opened the passenger-side door of Clark's 300ZX and pulled Phillips out of the car onto the sidewalk. From that vantage point, Phillips was looking in the direction of Clark's assailant but he did not get a good enough look at the assailant's face to be able to make an identification. Phillips was eventually able to escape Dixon's hold on him and ran from the scene. While running, Phillips heard multiple gunshots.

A bystander present at the scene, Darryl Jones (Jones), saw the commotion at Clark's car and heard the gunshots.[1] Jones was leaving the Danceteria just after two in the morning and observed a "scuffle" going on outside a car (Clark's car). A man standing outside the driver's side of the car was "pushing and pulling" with a man (Clark) partially inside and outside of the car. As the scuffle continued, Jones heard two gunshots, and then after a very slight delay when the man standing outside the car took a step back, four or five more gunshots. Jones believed

---

[1]     Jones also observed an earlier fight on the street outside the Danceteria while waiting to get in the club. The prosecution would later argue at defendant's trial that blood droplets found on the sidewalk after Clark's murder were attributable to this earlier fight and not, as the defense would contend, left behind by Clark's killer.

3

this second set of gunshots came from a "revolver-type weapon" because of pauses between the shots. After the shooting, the man that had been scuffling with Clark ran from the car along with another man (Dixon) that had been outside the passenger side of the vehicle. They ran toward a nearby gas station at the corner of Highland Avenue and Willoughby Avenue.

When travelling on Willoughby Avenue, the next street over from Highland Avenue is Citrus Avenue. James Ryan (Ryan) lived in an apartment on Citrus Avenue just around the corner from the Danceteria. At about 2:00 a.m. on June 29, 1987, Ryan had just finished the night shift at work (he was a journalist) and heard several gunshots—five by his estimate. He went to his second-floor window overlooking Citrus Avenue and saw two men, one of whom was carrying a handgun that appeared to be a revolver, running down the street toward him; the man with the gun was wearing a navy blue jacket or sweatshirt. The men were running toward a car stopped on Citrus Avenue that Ryan described as a white, "sporty looking coupe-type car" that he thought might be a Ford Mustang. Both men got in the passenger-side door of that car and the car sped off, leaving skid marks on the street.

Once the shooting outside the Danceteria stopped and Clark's shooter and Dixon fled, Phillips, Jones, and other bystanders congregated around Clark's car. Clark had multiple bullet wounds and he was "sprawled out over the centerpiece of the car," shaking. Phillips reclined Clark's seat to try to make him more comfortable until the paramedics arrived and transported him to the hospital. A subsequent autopsy determined Clark sustained four gunshot wounds (plus several fragment wounds) that caused his death. Several of the bullets

that struck Clark were found in his body during the autopsy, and later analysis of the bullets revealed they were fired from a single weapon, which was either a .38 or .357 caliber gun.

## B

### 1

Police officers and forensic personnel responded to the scene of Clark's killing and began investigating. Los Angeles Police Department (LAPD) Detective Rick Jackson was one of two detectives primarily assigned to the investigation.

In processing the crime scene, investigators recovered Clark's firearm: a .25 caliber semiautomatic pistol that was legally registered to him. Investigators also found an expended bullet, which later analysis would reveal was fired from Clark's gun, near one of the rear tires of Clark's car. Stuck to the bullet were some blue clothing fibers and what appeared to be a speck of human tissue.[2]

Investigators also examined Clark's car for fingerprints, and a print was found on the outside of the passenger-side window. Comparison of that fingerprint and Dixon's fingerprints were a match.

Also documented at the crime scene were blood spots on the sidewalk abutting the passenger side of Clark's parked car. The blood spots hit the ground at a near 90-degree angle such that

---

[2]     A very small amount of blood was also found on the bullet—too small to even permit a determination of whether the blood was type A, B, or O. DNA analysis of the bullet and materials adhering to it was not possible at the time of the crime in 1987.

5

they did not appear to have come from someone who was running or moving quickly at the time. Forensic personnel collected samples of the blood, and later analysis determined the blood type of these samples was not defendant's blood type.

In processing the crime scene, investigators also photographed the skid marks on Citrus Avenue made by the white car that Ryan saw speeding off with the armed man in blue and Dixon just after the shooting.

2

Investigation of Clark's murder continued after processing of the crime scene was complete, and the investigation ultimately led to defendant's arrest for Clark's murder.

LAPD detectives showed bystander Jones a six-pack photospread about a month after the shooting to see if he could identify Clark's shooter. Defendant was in position "3" on the photospread, and Jones said he was 85 percent certain the man in position 3 was the person he saw scuffling with Clark. Jones also stated, however, he was 80 percent confident that another man in position 2 on the photospread was the person he saw.[3]

On July 28, 1987, investigators executed a search warrant at defendant's mother's house, which was where defendant was living at the time. During the search, law enforcement officers found a photo of defendant posing in front of a white Ford Mustang while making a hand sign. Also seized during the search were an empty gun holster and a receipt for purchases

---

[3] Later at defendant's trial, Jones would testify without qualification that the man in position 3 was the person he saw scuffling with Clark.

made by defendant, defendant's brother Andre Romain (Andre), and defendant's longtime friend John Goines (Goines) during a visit they made to the Beverly Hills Gun Club.

After finding the photograph of the white Ford Mustang with defendant posing in front, law enforcement officers impounded the Mustang shown in the photo—which was registered in the name of Andre's fiancée at the time, Pamela Romain (Pamela). Although Pamela was the registered owner of the Mustang, Andre was the primary driver of the car and defendant drove it too. LAPD forensics personnel drove the Mustang to create test skid marks to compare with the skid marks left on Citrus Avenue. Comparison analysis revealed the test skid marks from the Mustang were "consistent" with the skid marks left on the night of the shooting (meaning the marks were similar in their pattern, width, and spacing; no more definitive conclusion than that could be drawn).

Defendant was arrested one month after Clark was fatally shot—on the same day the search warrant was executed. When he was taken into custody, officers noted and photographed two wounds on his right inner forearm that were still in the process of healing. The wounds were about three inches apart, and the one closest to his elbow was circular in shape while the wound closer to his wrist had more of an elliptical or teardrop shape. Detective Jackson asked Joseph Choi, a doctor in the county coroner's office, to examine the forearm wounds, which he did. At defendant's preliminary hearing in October 1987, Doctor Choi estimated the wounds were "a few weeks old" and opined they were most likely caused by a "through and through" gunshot wound—with the wound closest to the wrist being the entry wound and the wound near the elbow the exit wound. Doctor

7

Choi did allow, however, that it was possible the wounds could have been caused by being pierced with some sort of hard metal "poker" or similar object.[4]

Defendant's friend Goines (who was an LAPD police recruit at the time) also testified at the October 1987 preliminary hearing. Among other questions, Goines was asked whether he observed wounds on defendant's arm in July of that year. Goines testified that he did see wounds on defendant's arm and the wounds looked similar to wounds another of Goines's friends had sustained when shot in the shoulder.

Another of defendant's friends, Glen Tucker, was also a witness at the preliminary hearing. Tucker testified defendant gave him some firearms to keep for him in or before the summer of 1987. Specifically, defendant gave Tucker a .38 caliber revolver, a .357 caliber revolver, and two rifles. Tucker kept the firearms for a couple days and then returned them to defendant when Tucker's aunt did not want the guns in her house.

Defendant was held to answer at the preliminary hearing in 1987, but the murder charge against defendant was dismissed shortly thereafter on a motion pursuant to Penal Code section 995. The investigation into Clark's murder then went dormant for over a decade.[5]

---

[4] Doctor Choi opined the wounds were more likely caused by a through and through gunshot than a "poker" because the wound closest to the wrist was oval-shaped. The doctor explained that this sort of shape can be created by a bullet that travels with velocity and rotating movement while a "poker" would produce more of a "straight sticking in" type of wound.

[5] In the meantime, defendant was able to obtain employment as a military police officer at a United States Air Force base. He

## C

In 2001, partly at Detective Jackson's urging, the LAPD created a cold case homicide investigation unit. Detective Jackson was one of the investigators in the new unit, and the unit had some success in solving cases—largely as a result of improvements in DNA analysis and development of automated fingerprint databases.

In or about 2003, Jackson returned to the investigation of Clark's murder. He asked forensic personnel to see if a DNA profile could be generated from analysis of the fibers and tissue adhering to the bullet fired from Clark's gun on the night of his killing. LAPD forensics personnel separated the fibers and speck of tissue from the bullet and sent them to an outside DNA laboratory, Orchid Cellmark, for analysis. Orchid Cellmark determined the fiber and tissue samples were so small that testing them separately would risk developing an incomplete DNA profile. Orchid Cellmark accordingly sought and obtained permission from LAPD to test the fibers and tissue together as one sample, and through that testing, they obtained a full, single-source DNA profile from the material.

Knowing that a full DNA profile from the bullet-adhering material had been obtained, and suspecting defendant's DNA would match the profile, Detective Jackson and other investigators did two things. They obtained court authorization to wiretap defendant's phones (and several other target telephones), and they obtained authorization to take a buccal swab from defendant for DNA analysis. As a matter of

---

had also submitted applications to be a police officer at multiple local police agencies.

investigative strategy, the belief was that taking the swab from defendant would stimulate conversation on the wiretapped phones and have a fair probability of generating evidence regarding Clark's killing.[6]

## D

In 2004, the Los Angeles County District Attorney again charged defendant with murdering Clark. An amended information adding a personal use of a firearm sentencing enhancement was filed in 2009. There were lengthy delays in bringing the case to trial, owing in part to substitutions of counsel representing defendant and pre-trial motion practice.

Trial commenced in July 2017. There was no real dispute at trial about whether Clark was murdered; the question for the jury was whether defendant was the culprit. The prosecution presented evidence, some of which we have already detailed, to show defendant was Clark's shooter. With the trial court's permission and limiting instructions provided to the jury, the prosecution also introduced evidence that defendant was a member of the Rolling 60s Crips criminal street gang (at the time of the crime and for years thereafter) to explain the reluctance of two witnesses to testify and as evidence of a gang-related motive for the killing. The defense endeavored to establish reasonable

---

[6] Investigators intercepted hundreds of calls pursuant to the wiretap and seven of those were ultimately played at defendant's criminal trial. Most were played during cross-examination of defendant, who testified in his own defense. As we later discuss, a transcript of one of the two calls played during the prosecution's case-in-chief was the subject of significant dispute as to whether it accurately documented an admission by defendant.

doubt that defendant was present at the scene of the crime and suggested Clark had been killed as a result of some personal, perhaps drug-related dispute—possibly by defendant's brother Andre (who was deceased at the time of defendant's trial).[7]

1

Through testimony and exhibits, the prosecution introduced evidence to prove defendant was the man who shot Clark. A lab technician who worked at Orchid-Cellmark and analyzed the blue fibers and tissue on the bullet fired from Clark's gun determined the DNA profile obtained from the fibers and tissue matched defendant's DNA. Doctor Choi's preliminary hearing testimony was read into the record (Choi was deceased), and the prosecution also presented live testimony from another expert, emergency room doctor Marie Russell, who had seen "thousands" of gunshot wounds and opined the photos taken of defendant's forearm wounds in 1987 showed "very, very typical

---

[7] As we discuss *post*, defendant maintains his trial attorney changed his theory of the defense mid-trial (one of the bases for his claim that he received ineffective assistance of counsel): from a drug deal gone bad to an intended third-party culpability defense pointing to Andre as the killer. Though trial counsel did at one point profess to have changed his theory when confronted with an objection that he had not provided timely discovery, there are other indications in the record that the defense all along kept open the possibility of implying Andre was Clark's shooter (such an implication was not inconsistent with a claim that Clark was killed in a drug deal gone bad because the defense's position was that Andre was a drug dealer).

11

looking" healing gunshot wounds.[8] Jones testified and confirmed his 85-percent certain identification of defendant as the person he saw scuffling with Clark outside Clark's car. Ryan testified to his identification of the white car he saw speed off after the shooting (with the gunman wearing blue), and the prosecution introduced photos of the white Ford Mustang (driven primarily by Andre but also sometimes by defendant) along with expert testimony concerning the similarity of the skid marks made by that car and those left on Citrus Avenue. Tucker testified and was confronted with the preliminary hearing testimony he gave concerning the guns he held for defendant, including .38 and .357 caliber pistols (the same caliber of weapon that fired the bullets found in Clark's body during the autopsy). The prosecution also introduced evidence of Dixon's fingerprint left on Clark's car and elicited testimony that Dixon and defendant were friends.

There was also other evidence introduced by the prosecution that implicated defendant as Clark's killer. Pamela was called as a hostile witness and the prosecution read into the record her prior statement that Andre called her in the summer of 1987 sometime between two and four in the morning to ask her to come meet him because defendant had been shot; Andre also directed her to say, if ever asked by the police, that he was not with defendant that morning. Detective Jackson testified and provided foundation for admission of calls intercepted during the wiretap, including call number 260 (admitted as trial exhibit 105). The transcript of that call prepared by the prosecution

---

[8]     Doctor Russell also opined that gunshot wounds of the type shown in the photos would have "not very much bleeding at all."

reflected the prosecution's belief that defendant admitted shooting Clark (the bold type that follows is in the original):

[Defendant]: My whole thing is this homie, I gave you all . . . my slob, a vial of my slob seventeen years ago, [r]ight.  [W]hy you didn't test this shit on the DNA with the shit that was left at the scene[?]

[Unidentified] Male: Hell yeah[.]

[Defendant]: You know what [I'm] saying.  You know, you already tested it . . . .

[Unidentified] Male: They trying to say that the nigga that did the shooting, was nigga bleeding too[?]

[Defendant]: Yeah talking about **the nigga I shot**, you know I'm saying [sic], [t]hey was saying that the nigga, whoever killed this nigga got shot, know what I'm saying[.]

[Unidentified] Male: Yeah[.]

[Defendant]: And uhm, this his blood on the ground and this his blood on the bullet, so they test the blood on the ground, which was enough and compare it to mine and say it wasn't me.

[Unidentified] Male: Yeah[.]

[Defendant]: But the blood on the bullet, seventeen years ago, which was the same blood as the blood on the ground you know, I know this as well as they know this, you know what I'm saying[.]

In addition, the prosecution introduced motive evidence to help prove defendant was Clark's shooter.  Antonio Watts, an acquaintance of defendant's in 1987 who was an admitted drug dealer familiar with gang signs, testified he crashed *his* customized convertible Nissan 300ZX into defendant's car on

13

June 16, 1987—roughly two weeks before Clark's shooting. Watts' customized car was nearly identical to Clark's car (the two were the only cars Detective Jackson had ever seen that looked as they did), and the prosecution theorized Clark was targeted for a carjacking to replace Watts' totaled car after Watts paid for the damage to defendant's car. The prosecution also introduced evidence that defendant was a member of the Rollin 60s Crips at the time of the crime, that defendant said in a wiretapped call that he would get "up close and personal and do your business" rather than "hitting innocent bystanders" doing "drive bys," that Clark was wearing a red sweatshirt on the night he was shot, and that Dixon's fingerprint was found on Clark's car after at the shooting (defendant would later testify Dixon was a member of the Rollin 60s Crips).[9]

## 2

The defense put on a substantial case at trial, including defendant's testimony in his own defense.

Defendant testified he was not present on the street outside the Danceteria when Clark was killed. He testified he was not hanging out at night and going to night clubs at the time because

---

[9]    Evidence concerning the Rollin 60s Crips was also admitted to establish the reluctance of Watts and Pamela to testify. Indeed, evidence of defendant's gang membership was first introduced at trial to explain why Watts previously made inconsistent statements; Watts explained he made the earlier inconsistent statements because three Rollin 60s Crips told him what to say about how defendant got injured and he feared retaliation by the gang.

he was applying to be an LAPD officer and was "most likely" at home when Clark was killed.

Defendant also discussed the Rollin 60s Crip gang and when he joined it. According to defendant, he avoided the gang in his youth even though he grew up in a neighborhood within territory claimed by the Rollin 60s Crips. After graduating from high school, defendant enlisted in the Air Force, served as a military policeman, and was honorably discharged in October 1986. Defendant specifically denied being a member of the Rollin 60s Crips when Clark was shot, but he did admit he joined the gang in September 1987 when he was held in county jail after being arrested for Clark's murder. As defendant explained it, he joined the gang as a matter of survival because failing to join the gang while in custody would have left him vulnerable to being hurt, set on fire, sodomized, or killed. Defendant, however, conceded that, after being released from custody in December 1987, he remained a gang member for years—until 1994— because he was homeless, couldn't pursue work as a police officer, and lived with "one of the guys . . . [he] was incarcerated with" after they were both released. Defendant claimed he distanced himself from the gang in more recent years, obtained employment as a military police officer on an Air Force base, and did gang intervention volunteer work through "online ministry"— which, he contended, explained the numerous gang-related pictures still posted on his Facebook account.

Defendant also testified concerning the wounds on his forearm in 1987 and denied they were caused by a gunshot. He claimed he sustained the wounds on June 22 or 23, 1987, (about a week before Clark was shot) when his brother Andre stabbed him

15

with an ice pick while they were fighting.[10]  Defendant did not recall which of the two piercing wounds was made by the ice pick first, nor did he remember whether the ice pick caused an exit wound after entering his skin because "[i]t was 30 years ago" and he was "fighting for [his] life at that point."  Defendant additionally testified Andre would wear his tops, jackets, and shirts.

During his testimony, defendant also disputed the accuracy of the prosecution's transcription of wiretap call number 260. Defendant testified he did not say "the nigga I shot" on the call; instead, he maintained he said "the nigga that got shot," but was speaking quickly.

Finally, at other points in his testimony, defendant asserted he owned only a rifle and a shotgun and had not purchased any handguns (though, as recounted *ante*, both Tucker and Goines testified defendant did have one or more handguns); he stated he was not friends with Dixon (contrary to testimony from defendant's longtime friend Goines); and he conceded he was depicted making a "neighborhood sign" (Watts identified it as a Rollin 60s Crip gang sign) with his hand in the photo of

---

[10]     When first asked to explain the circumstances surrounding the fight, defendant blurted out that Andre was a drug dealer; the trial court struck the answer and admonished the jury to disregard it.  Defendant was thereafter permitted to explain what happened during the fight, including the claimed ice pick stabbing, but he was precluded by the court from testifying about what precipitated the fight.

Pamela's Mustang seized pursuant to the search warrant, i.e., before he was held in county jail after his arrest.[11]

In addition to defendant's testimony, the defense presented testimony from two expert witnesses. The first, an expert in DNA analysis, agreed DNA found on the materials adhering to the bullet from Clark's gun was defendant's DNA but explained it was possible for a person to transfer their DNA to an object or clothing through touching or wearing.[12] The second, a doctor testifying as an expert on gunshot wounds, opined the photos of defendant's forearm wounds possibly depicted a through and through gunshot wound or an injury caused by a very sharp instrument, but a gunshot wound was "highly unlikely" in light of the location of the wound (the doctor believed the trajectory of the bullet would have hit some other area of defendant's body upon exiting the arm).

3

The prosecution presented a short rebuttal case. A witness testified to gang tattoos observed on defendant to contradict his assertion that he never had gang tattoos on his arms that had been removed. Another witness discussed the circumstances in

---

[11] The prosecution also impeached defendant with a 1991 misdemeanor conviction for carrying a loaded firearm in participation with a known criminal street gang. Defendant does not argue there was error in permitting this impeachment.

[12] The defense's DNA expert also explained there was no way to determine whether defendant's DNA came from the blue fibers, the human tissue, or both because the fibers and tissue were combined for analysis.

17

which transfer of DNA through touching objects may or may not occur. A gang expert discussed the Rollin 60s Crips, why it was unlikely defendant maintained gang photos on his Facebook account for gang intervention purposes, why gang members typically "take care of their drug dealers," and why Rollin 60s Crips "would not have a problem" robbing someone wearing red. And Detective Jackson testified that, in 1987, defendant told him he sustained the right forearm wounds in a car accident and did not mention having been stabbed with an ice pick.[13]

4

After the close of evidence, the prosecution and defense joined in requesting pattern instructions on murder, including felony murder. The defense asked the court to give a third-party culpability special instruction in light of the defense desire to suggest Andre could have been Clark's shooter. The trial court declined to give a third-party culpability instruction, citing *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*) and explaining the defense had not made a sufficient showing to warrant such an instruction.[14]

---

[13] On cross-examination, Detective Jackson confirmed he had received a report from another detective, Rozzi, who examined defendant's body; Jackson, however, was not present for the examination. When the defense asked Detective Jackson if Detective Rozzi questioned defendant about the scars on his forearm, the prosecution objected on hearsay grounds and the trial court sustained the objection.

[14] *Hall* holds that "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:

After deliberating for roughly a day and a half, the jury convicted defendant of first degree murder and found the associated firearm use enhancement true.[15]  With new counsel, defendant filed a 78-page motion for new trial arguing there had been errors in the introduction and exclusion of evidence, defendant's trial attorney had been constitutionally ineffective (no declaration from trial counsel was submitted), and there had been instances of "prosecutorial error."  The trial court denied the motion and sentenced defendant to 27 years to life in prison: 25 years for the murder conviction and two years for the firearm enhancement.  This appeal ensued.

## II

The host of arguments defendant presents to seek reversal of his conviction mainly track those presented to the trial court in his motion for new trial.  He argues (1) certain evidence the prosecution presented was improperly admitted, (2) certain evidence he wished to present or elicit was wrongly excluded, (3) the trial court committed instructional error by refusing his request for a third-party culpability instruction and by not instructing sua sponte on the lesser included offense of voluntary manslaughter, (4) his trial attorney provided constitutionally

---

there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*Id.* at 833.)

[15]     During deliberations, the jury submitted one question to the court, which asked whether brandishing a firearm implies malice aforethought.  The trial court responded to the question largely by re-reading the pattern instruction defining implied malice.

19

deficient representation in various ways, and (5) the prosecution committed misconduct by not acknowledging the existence of a prior consistent statement by defendant about how he sustained the forearm wounds. Defendant also contends we should remand the matter so the trial court can consider whether to strike, in the interest of justice, the firearm enhancement imposed at sentencing.[16] For reasons we first summarize and then detail,

---

[16] We omit from this list contentions that are inadequately presented for decision and thus forfeited. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793.) Specifically, defendant's opening brief asserts in a single paragraph that the evidence was insufficient to permit the jury to find malice aforethought and makes only a cursory argument that defendant's trial attorney was prejudicially ineffective in failing to move to suppress the calls intercepted pursuant to the wiretap warrant.

In addition, prior to submission of the cause, this court invited defendant to bring to the court's attention—via a letter complying with California Rules of Court, rule 8.254 (rule 8.254) or an application to file a supplemental brief—new authorities, new legislation, or other matters that were not available in time to be included in his opening brief. Defendant did not ask to file a supplemental brief. Instead, he submitted a one-page letter that cites new authority in compliance with rule 8.254 as to the sentencing issue he briefed but also raises entirely new issues: one-sentence assertions that defendant may benefit from legislative amendments made by Senate Bill Nos. 1473 (2017-2018 Reg. Sess.), 775 (2021-2022 Reg. Sess.), and 1209 (2021-2022 Reg. Sess.). These new issues are also forfeited as inadequately presented, but nothing in this opinion precludes defendant from pursuing in the trial court the petition procedure provided by Penal Code section 1172.6. (Pen. Code, § 1172.6, subd. (d)(3).)

none of the arguments defendant makes for reversal is meritorious.

The trial court did not err in admitting evidence of defendant's gang membership, of Andre's "[defendant] got shot" statement to Pamela during the middle of the night telephone conversation, or Goines preliminary hearing testimony that defendant's arm wounds looked like gunshot wounds. The bulk of the gang evidence at trial came in as a result of defendant opening the door to such evidence during his testimony, and the trial court's decision to allow the prosecution to introduce the limited gang evidence that came in during its case-in-chief—to permit the jury to assess Watts and Pamela's credibility and as evidence of a possible motive for killing Clark—was not an abuse of the trial court's discretion. The trial court also did not abuse its discretion in concluding Andre's statement to Pamela qualified for admission under the spontaneous statement exception to the hearsay rule; the court could reasonably infer from the circumstances surrounding the statement that Andre was still under the stress of having seen his brother's injury. Goines's testimony that defendant's forearm wounds looked similar to a gunshot wound he had seen was properly admitted to allow the jury to evaluate his bias favoring defendant, and insofar as defendant argues the prosecution misused the testimony as substantive evidence of the cause of defendant's wounds, such use was cumulative and obviously harmless in light of the expert evidence received from Doctors Russell and Choi (and the doctor called by the defense).

The trial court also did not err in preventing the defense from presenting its own transcript of wiretap call 260, from presenting testimony by Pamela about bad acts committed by

21

Andre, from eliciting testimony from defendant about the circumstances preceding his claimed ice pick fight with Andre, from questioning Doctor Russell about reports authored by Doctor Choi that Doctor Russell did not recall reviewing, and from eliciting testimony from Detective Jackson about statements made by defendant to Detective Rozzi—outside Detective Jackson's presence—about the cause of defendant's forearm wounds. At trial, the defense never asked to present its own transcription of call 260 and the jury was repeatedly instructed that the recording itself was what controlled, not the transcript which was merely a guide to facilitate listening. The defense was not entitled to have Pamela testify about drug dealing and crimes committed by Andre because this generalized criminal propensity evidence is not proper third-party culpability evidence and because, in any event, there was no adequate evidence proffered that linked Andre to the actual commission of the murder. Inquiry into the dispute between defendant and Andre that preceded the claimed ice pick fight was properly excluded, as the trial court put it, as an attempt to "dirty up Andre" that had little if any relevance and would confuse the issues. The trial court correctly precluded the defense from cross-examining Doctor Russell about reports written by Doctor Choi that she had not relied on in forming her opinion, and regardless, Doctor Choi's testimony was read into the record. And the trial court was right that hearsay rules barred Detective Jackson from testifying to a statement defendant made to Detective Rozzi when Detective Jackson was not present.

Reversal also is not warranted because the trial court rejected the defense request for a third-party culpability instruction or because the court did not instruct the jury sua

22

sponte on voluntary manslaughter as a lesser included offense. Even assuming there was adequate evidence before the court to justify giving a pinpoint instruction on third-party culpability, the absence of such an instruction was harmless. Contrary to defendant's assertion in his opening brief, the trial court did not preclude the defense from suggesting Andre may have been Clark's shooter (that is indeed what the defense implied during closing argument) and the court's instruction on reasonable doubt sufficed to inform the jurors that acquittal was required if there was reasonable doubt as to whether someone else shot Clark. No sua sponte instruction on heat of passion or imperfect self-defense voluntary manslaughter was required because such an instruction was inconsistent with the defense at trial as put forward by defendant's own sworn testimony: that he was not the shooter and wasn't even present outside the Danceteria when Clark was shot.

Also unmeritorious in this direct appeal from the judgment of conviction are defendant's claims that his trial attorney was constitutionally ineffective by not interposing hearsay objections when the prosecution read prior testimony of several witnesses into the record and by purportedly being "underprepared" (as shown by untimely production of defense discovery, an asserted failure to have reviewed all the wiretap calls, the failure to retain experts to contradict the prosecution's transcription of wiretap call 260 and the prosecution's gang expert, and presentation of what defendant now argues was an "incoherent defense"). Demonstrating ineffective assistance of counsel on direct appeal is "difficult" (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*)) because, as is the case here, "the appellate record will often not sufficiently reveal why the defense counsel acted or failed to act

23

on any given occasion" (*id.* at 198-199) and defendant must in any event show any deficient performance was prejudicial (*id.* at 198). None of defendant's ineffective assistance of counsel claims meet this demanding standard.

Finally, we do not believe prejudicial misconduct by the prosecution during rebuttal argument has been shown on this record (the prosecution suggested only that the jury have testimony read back to determine if Detective Rozzi's name was mentioned before closing argument) and defendant's request for a remand so the trial court can consider striking the personal use of a firearm enhancement is forfeited because the trial court had such discretion at the time of sentencing and defendant never asked the trial court to exercise it.

## A
### 1

Before trial, the prosecution moved to admit evidence of defendant's membership in the Rollin 60s Crips on two grounds. First, the prosecution argued defendant's gang affiliation was relevant to motive and identity; as to motive, the prosecution argued (among other things) that defendant made statements on wiretapped calls concerning how he, as a gang member, would take care of his victims by going straight up to them and shooting rather than doing drive-bys. Second, the prosecution argued defendant's gang affiliation should be admitted to explain why Watts and Pamela may testify consistent with a fear of retaliation from the gang. At the defense's suggestion, the trial court deferred ruling on the motion in limine until the evidence was actually offered at trial, but the court stated its indicated ruling would be to permit the prosecution to establish defendant's

24

gang membership as evidence of motive if wiretap evidence as represented by the prosecution was received.

Once trial started, the trial court admitted evidence of defendant's gang membership early on, but for the second of the prosecution's argued reasons.[17] The prosecution asked Watts to explain why he previously testified falsely at defendant's 1987 preliminary hearing when he was asked how defendant sustained his forearm injuries. Watts said he testified the way he did because someone told him what to say, and the prosecution sought the court's permission to elicit testimony that men Watts knew to be Rollin 60s Crips were the ones who told him what to say about how defendant was injured. After an Evidence Code section 402 hearing outside the jury's presence, the trial court considered the probative and prejudicial potential of the testimony and agreed Watts could testify that defendant was a member of the Rollin 60s Crips and others in the gang told him he should testify in a particular manner at the preliminary hearing.

Watts thereafter testified that defendant was a member of the Rollin 60s Crips (in his words, defendant was "from there") and the hand sign defendant was making in the photo posing in front of the Mustang was a Rollin 60s Crips gang sign. At the conclusion of Watts' direct examination, the trial court

_____

[17] The court sustained an earlier defense objection when the prosecution argued Watts should be allowed to testify defendant was making a Rollin 60s Crips gang sign as evidence of a gang-related motive for Clark's murder. At that point in the trial, the court believed admitting evidence of defendant's gang affiliation on motive grounds was premature because gang members can commit crimes for personal reasons.

25

admonished the jury that the gang evidence had been received for a limited purpose.[18]

In the remainder of the prosecution's case-in-chief, introduction of additional gang evidence was sparse and policed by the trial court. During Pamela's testimony, the prosecution played a recording of interview statements to investigators where she expressed fear of having to testify because "all those Rolling 60s and somebody" might "end up doing something to [her] later." Goines testified he knew of defendant's connection to the Rollin 60s Crips at the time when he saw the healing wounds on defendant's arm. There was also what the jury could properly infer was a reference to gang activity in one of the wiretap calls the prosecution played during its case-in-chief: the call where defendant stated he operated by getting "up close and personal and do[ing] . . . business" rather than "hitting innocent bystanders" with "drive bys."

---

[18] The trial court stated: "I am going to give you a limitation on considering gang evidence. It will apply to this witness, as well as other witnesses, and you will get the full instruction at the close of the trial. [¶] [Y]ou can consider the evidence of gang activity only for the limited purpose of deciding whether the defendant had a motive to commit the crime, and there may or may not be other evidence introduced as to that, or you may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by a witness or an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purposes. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." A similar limited purpose instruction was given to the jury just before deliberations.

Significantly more evidence of defendant's gang membership and involvement (including Facebook account pictures and additional wiretap calls) did come in after defendant testified. That evidence was admitted, however, because the defense consciously opened the door to such evidence by having defendant testify to his good character.[19]

We review a trial court's decision to admit gang evidence as relevant to a charged offense and substantially more probative than prejudicial under the abuse of discretion standard of review. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) Under settled precedent, in cases where a gang enhancement is not charged, "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148,

---

[19] When defense counsel sought to elicit testimony from Pamela that defendant was previously in the military and "wasn't a gang person," the prosecution initially objected. At sidebar, the prosecution withdrew its objection and the court said to defense counsel, "Think about what you are doing. It's up to you. You are going to open the door." Defense counsel responded he was going to "bring it up in [his] case-in-chief" and "talk about all the character stuff in [his] case-in-chief."

1168 ["Gang evidence is also relevant on the issue of a witness's credibility"].)

The trial court's decision to permit the prosecution to introduce evidence of defendant's gang membership was not error. In fact, defendant does not actually challenge the principal basis on which the trial court allowed *evidence* of his membership in the Rollin 60s Crips: because it was relevant to the credibility of Watts and Pamela. Instead, defendant's real complaint is that the prosecution *argued* a theory unsupported by the evidence admitted, i.e., that defendant attempted to steal Clark's car to replace Watt's car that was totaled because he wanted to "take care" of Watts, who was one of the Rolling 60s Crips' drug dealers. There was no objection in the trial court, however, when the prosecution argued that theory to the jury, nor is there a challenge to that argument (as opposed to the admission of evidence) in this appeal.

Even if defendant had argued the prosecution's argument was improper because there was no evidence Watts was a member of the Rollin 60s Crips, that argument would still fail for two related reasons. First, the jury could reasonably infer from Watts' testimony that he was an associate of the Rollin 60s Crips even if he was not a full-fledged member: Watts admitted while testifying that he was a drug dealer in 1987, he was familiar enough with Rolling 60s Crips gang signs to be able to identify one that defendant made in the photo of him posing in front of the Mustang, and he associated with defendant and Andre, both of whom were in the gang. Second, the prosecution's replacement car motive theory did not depend on Watts being a member of the Rollin 60s Crips. Defendant could have a motive to replace Watts' car if Watts was just an associate of the gang, or even if

28

Watts was just friends with defendant and Andre and not affiliated with the Rollin 60s Crips at all.

2

In a 2003 audio-recorded interview with detectives, Pamela recalled an instance in the summer of 1987 when she was awakened in the middle of the night, somewhere between two and four in the morning, by a phone call from her then-fiancée Andre. In that phone call, Andre told Pamela "[defendant] got shot" and asked Pamela to come meet him somewhere "for [defendant]." Either during that same conversation or a later one (the record is not clear), Andre also told Pamela that the police thought Andre was with Pierre that night and Pamela should say "[Andre] was not with [defendant] or they left together but then they weren't together later . . . ."

The prosecution sought to admit Andre's statement to Pamela under the spontaneous statement exception to the prohibition on hearsay. The trial court agreed the statement met the requirements of the exception and was admissible. Specifically, as to the requirement that such a statement be made to describe a condition or event perceived by the declarant, the court found it could infer the requirement satisfied in light of Andre's direction to Pamela to say he was not with defendant; in the court's words, Pamela was "told make up a story so he's not there, which indicates he is there." Our review of this ruling is for abuse of discretion (*People v. Merriman* (2014) 60 Cal.4th 1, 65 (*Merriman*)) and we hold there was no such abuse.

Evidence Code section 1240 states "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) [p]urports to narrate, describe, or explain an

29

act, condition, or event perceived by the declarant; and [¶] (b) [w]as made spontaneously while the declarant was under the stress of excitement caused by such perception."

"The admissibility requirements for such out-of-court statements are well established. "'(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.] A statement meeting these requirements is 'considered trustworthy, and admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." [Citation.]' [Citation.] [¶] A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.' [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication." (*Merriman, supra*, 60 Cal.4th at 64.)

Defendant contends the trial court erred in admitting Andre's statement to Pamela because there was no evidence Andre sounded excited or stressed at the time he made it, nor any evidence Andre saw defendant get shot or even saw his gunshot wound.[20] The former point is wrong on the law and the latter point is wrong on the facts. As to the former, precedent is clear that the outward demeanor of a declarant is not dispositive of whether the declarant remained under the stress or excitement of a startling event. (See, e.g., *People v. Poggi* (1988) 45 Cal.3d 306, 319 ["the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity"] (*Poggi*).) The question instead is whether all the circumstances indicate the declarant was still under the influence of a startling event (*Merriman*, *supra*, 60 Cal.4th 64) and here, the trial court did not abuse its discretion in finding Andre was. Encountering a sibling just wounded by a gunshot is certainly startling, and the court could reasonably infer from the circumstances of the call Andre placed—coming in the middle of the night, at most two hours after defendant was shot—that Andre was still under the influence of the startling event. (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 926 [declarant's statement came two to seven hours after the "shocking and disturbing events"]; *Poggi*, *supra*, at 319 [declarant still under the influence of an attack 30 minutes after it occurred].) As to the latter contention, the trial court was justified in inferring Andre was with defendant and in a position to see his fresh gunshot wound for the reason the court

---

[20] Insofar as defendant contends that admission of Andre's statement is a constitutional Confrontation Clause violation, the point is forfeited. (*People v. Redd* (2010) 48 Cal.4th 691, 730.)

did: because Andre's direction that Pamela lie and say he was not with defendant indicates that Andre was with him at the time.

Defendant, however, counters that Andre's instruction to say he was not with defendant is an indication Andre's statement that defendant got shot lacks indicia of trustworthiness because it shows Andre's reflective faculties were not stilled. There are two responses to this. First, we do not believe the trial record is clear that Andre's instruction to say he was not with defendant came in the same phone call when he told Pamela that defendant got shot. Second, even if it did come in the same call, that is not the sort of contrivance that undermines the trustworthiness of Andre's declaration that defendant got shot. If anything, Andre's instruction that Pamela lie to the police tends to heighten the trustworthiness of the unguarded statement he made when waking up his then fiancée to come meet him in the middle of the night; a desire to avoid being implicated in what was truly a shooting helps explain why Andre wanted to Pamela to give the police a false account of his whereabouts.

3

During the prosecution's case-in-chief, the trial court held an Evidence Code section 402 hearing outside the presence of the jury to consider whether the prosecution could elicit testimony from Goines that he saw wounds on defendant's arm that looked like a gunshot wound he had previously seen. The trial court ruled Goines lacked the expertise to offer an opinion on the cause of defendant's wounds, but the court found Goines to be an "evasive" witness and permitted the prosecution to confront Goines with inconsistencies between his preliminary hearing testimony that defendant appeared to have sustained a gunshot

32

wound and a later statement in an interview with detectives that defendant told him the wounds were caused by some kind of "pole" or "poker" to permit the jury to fully assess Goines's credibility and potential bias in defendant's favor.

That is what the prosecution ultimately did, and defendant argues this was error. He contends the prosecution improperly impeached Goines with his preliminary hearing testimony because Goines did not testify inconsistently with that testimony during trial.

There was, however, no impeachment. The preliminary hearing testimony was not before the jury as a prior inconsistent statement; indeed, the prosecution never read Goines's preliminary hearing testimony about defendant's wounds to the jury at all. Instead, the prosecution asked Goines if he recalled saying at the preliminary hearing that defendant's wounds looked similar to a gunshot wound Goines had seen, and Goines said he did recall so testifying. To be sure, the prosecution did highlight the inconsistency in defendant's two out-of-court statements (one at the preliminary hearing and the other in an interview with detectives), but that was done for the permissible purpose of demonstrating Goines's bias in defendant's favor—to show that over the years, and in light of tension between Goines's and defendant's families caused by the charge in this case, Goines was willing to shade his testimony in defendant's favor. (See generally *United States v. Abel* (1984) 469 U.S. 45, 52 ["Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony"].)

Defendant's real complaint appears to be that the prosecution used Goines's recollection of his prior preliminary hearing testimony in a manner that went beyond the reason why the trial court allowed the prosecution to inquire about it. Specifically, defendant believes "the entire purpose for Goines'[s] testimony" was to elicit the prior statement that defendant wounds looked similar to a gunshot wound and the prosecution relied on that testimony not just to argue Goines was a biased witness but to bolster the case that defendant's wounds were, in fact, gunshot wounds. We do not believe that precisely characterizes all the reasons why the prosecution presented Goines's testimony (e.g., to establish defendant and Dixon were friends notwithstanding defendant's denial) or how the prosecution relied on the testimony. But even if defendant is right that the prosecution transgressed the reason why the trial court allowed reference to Goines's preliminary hearing testimony, any error was still harmless. In light of the extensive expert opinion evidence admitted during trial about whether defendant's forearm wounds were gunshot wounds, there is no reasonable probability the jury would have been swayed by Goines's observations of the wound over the opinions of the three doctors who testified.

B

1

Prior to the presentation of evidence at trial, the trial court heard defense objections to the prosecution's transcription of wiretapped calls it intended to use. Chief among the objections was the defense contention that defendant said "the nigga that

34

got shot" during wiretap call 260—not "the nigga I shot" as reflected in the prosecution's transcript of the call.

The trial court listened to the audio recording of that call and found it was "very obvious" that defendant said "I shot," not "got shot" on the call. The court additionally explained its view that, regardless, it only needed to assure itself the transcript was not completely wrong or completely different from the recording because the jury was the finder of fact (as the trial court put it, the jurors' "ears are what controls") and it would admonish the jury that the prosecution's transcript was only a guide or listening aid and the actual evidence was the recording itself. The court accordingly ruled the prosecution could use the transcript it prepared, but the court emphasized it would give the usual admonition that what jurors hear on the recording controls. True to its word, the trial court did so admonish the jury not only just before wiretap call 260 was played, but also on at least six other occasions during trial.

Defendant now argues the defense was improperly denied the right to present its own transcript of call 260. The argument fails for the most obvious of reasons: the defense never asked the trial court to present its own transcript, and the court cannot be faulted for refusing to grant a request the defense never made. Further, insofar as defendant contends it was error to permit the prosecution to use the transcript of the call regardless of whether he offered his own alternative transcription, the contention still fails. The defense was not precluded from presenting the jury with its own account of what was said on the transcript—indeed, that account came from defendant, the very person who was speaking on the wiretapped call—and the admonitions given repeatedly by the trial court sufficed to ensure the jury

35

determined the facts from the recording itself, not the transcript provided.[21] (See, e.g., *People v. Jones* (2017) 3 Cal.5th 583, 611; *People v. Polk* (1996) 47 Cal.App.4th 944, 955 ["[I]t is our opinion the transcript prepared by the prosecution was sufficiently accurate in material respects to justify its use by the jury"].)

2

The trial court had several discussions with the parties during trial (outside the presence of the jury) about whether third-party culpability evidence was admissible, i.e., whether the defense was entitled to present evidence that Andre, not defendant, was Clark's shooter. Defendant contends these discussions were the source of three errors: the trial court did not permit the defense to elicit certain testimony from Pamela that the defense believes would have bolstered the case that Andre was the culprit, the trial court declined to give a third-party culpability instruction based on the evidence that was received during trial, and defense counsel provided ineffective assistance

---

[21] We have listened to the recording ourselves and, apart from the disputed statement at issue, there are other minor discrepancies that fairly frequently arise between what we hear and what the transcript says (or does not say). These discrepancies make it more likely that the jurors were focused on the audio recording as the evidence. Thus, while we do not share the trial court's confidence that defendant clearly says "the nigga I shot" as opposed to "the nigga got shot" (particularly when considering the full context of the call), the need to make a determination one way or the other was squarely presented to the jury for decision and we do not doubt they resolved the dispute without being unduly influenced by the transcript.

36

by seeking to mount a third-party culpability defense only midway through trial.  At the moment, we address only the first of these; discussion of the other two assignments of error comes later.

"Like all other evidence, third party culpability evidence may be admitted if it is relevant and its probative value is not substantially outweighed by the risk of undue delay, prejudice, or confusion, or otherwise made inadmissible by the rules of evidence.  (Evid. Code, §§ 350, 352; see [ ]*Hall*[, *supra*,] 41 Cal.3d [at] 834[ ].)  'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.'  (*Hall*, [*supra*,] at [ ] 833[ ].)  For example, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt . . . ."  (*Ibid*.)  Moreover, admissible evidence of this nature points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime.  [Citations.]  For the evidence to be relevant and admissible, 'there must be *direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*'  (*Hall*, [*supra*,] at [ ]833[ ], italics added.)  As with all evidentiary rulings, the exclusion of third party evidence is reviewed for abuse of discretion.  [Citations.]"  (*People v. Turner* (2020) 10 Cal.5th 786, 816-817.)

At an Evidence Code section 402 hearing, the defense argued it should be permitted to elicit the following testimony

37

from Pamela: (1) Andre was twice arrested for stealing cars (including once from an elderly lady at gunpoint), (2) Andre was very abusive in their relationship and had gone to prison on a domestic violence charge, (3) Andre sold drugs at his mother's house and was "doing shady stuff in the streets," and (4) Andre had been imprisoned for either pistol-whipping or stealing money from "some guy." The trial court precluded the defense from eliciting the testimony because the defense had not adequately established a link between Andre and Clark's murder.

Defendant argues this was error and he should have been allowed to have Pamela tell the jury about all of this. The argument is meritless, for two related reasons. First, the proffered testimony from Pamela was generalized criminal propensity evidence that is inadmissible to establish third-party culpability. (*People v. Elliott* (2012) 53 Cal.4th 535, 580-581 ["Evidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity. [Citations.] For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, "'[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'" [Citations]".) Second, for third-party culpability evidence to be admissible at all, there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime (*Hall*, *supra*, 41 Cal.3d at 833), and there was no adequate evidence of such a link here. To be sure, there was evidence that the Mustang used as the getaway vehicle was primarily driven by Andre (though no one saw that vehicle in the immediate area of where the shooting occurred) and testimony from defendant that Andre wore his tops (though when or even how often the jury was not told). But

neither of these facts (if facts they are) links Andre to the actual perpetration of the shooting—particularly when it was defendant's DNA profile found on the bullet-adhering material, when there was uncontested proof that Dixon was the second of the two men that accosted the occupants of Clark's car, and when Andre was the one who told his fiancée that defendant had been shot.

3

During defendant's direct examination, the trial court sustained hearsay and relevance objections when defendant was asked to recount the argument with Andre that preceded the fight where he claimed to have been stabbed in the arm with an ice pick.[22] The trial court ruled defendant could testify to the fight itself and any injuries that resulted from it, but not words spoken or the reason for the purported argument between the two brothers. The court explained the circumstances that preceded the fight were not relevant, would call for hearsay, and would be excluded under Evidence Code section 352. Elaborating, the trial court found the attempt to elicit testimony about the asserted reason for the fight was "just an attempt to dirty up an individual who you hope at some point to be able to show as a third[-]party culpability individual, and I am not going to allow it. It's just back dooring it."

---

[22] Asked for a proffer of what defendant would say if allowed to testify about the reason for the fight, the defense explained defendant would testify the confrontation occurred as a result of Andre selling drugs at their mother's house and defendant's objection to that.

Defendant argues the trial court's ruling was error because the reasons for the fight between the brothers was relevant.[23] Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court's ruling was correct. An account of the fight itself and how defendant sustained the injuries to his arm was relevant to whether he shot Clark (or, perhaps more precisely, whether Clark shot him). Why defendant and Andre were fighting, on the other hand, had no tendency to prove or disprove the shooter's identity.

Defendant's only rejoinder is the claim that providing an account of the reason for the fight was necessary so defendant's claim that the fight occurred would be believable—an argument he also made to the trial judge. We are unpersuaded. The trial court's ruling left defendant free to describe any number of details about the fight itself and its aftermath that might increase the believability of his account, e.g., what exactly the ice pick looked like, how exactly the ice pick pierced his forearm, and how many times he was stabbed. The problem was just that defendant's memory was either hazy or nonexistent as to these details. We accordingly believe the record demonstrates the trial court had the right view of the matter: the attempt to elicit testimony about the reason for the fight was really just an

---

[23] Defendant does not challenge the trial court's exclusion of the evidence on Evidence Code section 352 grounds, and this alone is reason to reject defendant's challenge to the trial court's ruling.

improper attempt to introduce inadmissible third-party culpability criminal propensity evidence.

## 4

During the testimony of Doctor Russell, the defense inquired as to whether she had been given any reports authored by Doctor Choi concerning his examination of defendant or advised that Doctor Choi testified in a prior hearing. Doctor Russell did not recall seeing any reports or being advised of Doctor Choi's testimony. The trial court warned the defense that questions of Doctor Russell concerning conversations with Doctor Choi, testimony of Doctor Choi, or Doctor Choi's opinions would be hearsay. The defense asked to be heard at sidebar and argued Doctor Russell could testify to these topics because "opinions are always what the experts rely on." The trial court explained questions in these areas would still call for hearsay because Doctor Russell had no recollection of relying on Doctor Choi's opinions, but the court also pointed out that Doctor Choi was on the prosecution's witness list. When the prosecution confirmed it intended to read Doctor Choi's preliminary hearing testimony into the record and the trial court noted the testimony was accordingly "coming in one way or the other," defense counsel responded, "Okay[, n]o problem" and concluded his cross-examination.

Defendant now contends, however, that the trial court improperly limited his cross-examination of Doctor Russell by not permitting questions concerning Doctor Choi's opinions. We believe the point was likely waived by trial counsel's "no problem" statement after learning Doctor Choi's testimony would be read into the record. But even assuming the point was not waived, it

41

is still unavailing. The defense was permitted to ask Doctor Russell if she reviewed any materials from Doctor Choi and she said she did not recall doing so. Thus, to the extent the defense sought to invoke Doctor Choi's reports or testimony to challenge the comprehensiveness of Doctor Russell's review of the case, that aim was achieved. To the extent that the defense's true aim in cross-examining on this point was instead to place the substance of Doctor Choi's conclusions before the jury, that would indeed be relating inadmissible hearsay (*People v. Sanchez* (2016) 63 Cal.4th 665, 686) and, in any event, the prosecution's later reading of Doctor Choi's testimony to the jury necessarily cured any assumed error.

5

As we detailed earlier in the margin, on cross-examination, the defense asked Detective Jackson if Detective Rozzi questioned defendant about the scars on his forearm, the prosecution objected on hearsay grounds, and the trial court sustained the objection. Subsequently, however, the trial court suggested the prosecution might stipulate to any statement defendant made to Detective Rozzi if the prosecution were satisfied there was such a statement and it was accurately documented. The prosecution said it could not represent it was satisfied any documentation was accurate, and the trial court then asked the prosecution to try to help locate Detective Rozzi (who had since retired). The prosecution agreed to do so but ultimately was not able to contact him.

Defendant argues the trial court's hearsay ruling was an unreasonable limitation on cross-examination of Detective Jackson because investigators believed Detective Rozzi's

42

documentation of the statement was sufficiently reliable to be included in police reports and in affidavits in support of the search warrant and wiretap they obtained. This misses the point. Hearsay rules are markedly different for criminal trials as opposed to warrant affidavits and, certainly, police reports. The trial court was correct that Detective Jackson could not testify to an out-of-court statement that was not an admission and that he did not hear. (Evid. Code, § 1200 [hearsay, or "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is inadmissible].)

C

There was little disagreement between the parties during trial over the pattern instructions that should be given to the jury. The prosecution did object, however, to the defense's proposed special instruction on third-party culpability. As drafted (and in most relevant part), that instruction would have informed the jury that "[i]f after considering all the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find him not guilty." The trial court ruled the instruction "would be fine if we had put on third-party culpability evidence, but we did not. You were precluded because of People versus Hall."

As should be apparent from our discussion thus far, we doubt there was sufficient evidence to merit giving the defense's requested third-party culpability pinpoint instruction. But even assuming the contrary for argument's sake, the trial court's refusal to give such an instruction was still harmless. Our

43

Supreme Court has observed that a third-party culpability instruction of the type defendant requested in this case "add[s] little to the standard instruction on reasonable doubt." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.) For that reason, the *Hartsch* court held that "even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Ibid*.) Here, the trial court's rejection of the defense's proposed third-party culpability instruction is harmless for precisely this reason. (*Ibid.* [omission of a third-party culpability pinpoint instruction, even if error, could not have affected the verdict because "[i]t is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes" and because "[t]he closing arguments focused the jury's attention on that point"].)

Defendant additionally contends that the trial court erred by not giving an instruction he did not request. He maintains the court should have instructed, sua sponte, on the lesser included offense of voluntary manslaughter, predicated on either a heat of passion or imperfect self-defense theory. We have no quarrel with the proposition that a trial court generally does have a duty to instruct sua sponte on lesser included offenses, but that duty does not arise if the defense is inconsistent with the defendant's theory of the case. (See, e.g., *People v. Nguyen* (2015) 61 Cal.4th 1015, 1052 ["'A trial court's duty to instruct, sua sponte, on particular defenses arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence

44

supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case""""].)  Because the thrust of the defense in this case was mistaken identity and defendant testified he wasn't at the scene of the crime, a voluntary manslaughter defense would be inconsistent with the defense theory and an instruction was not required.

Indeed, the pertinent facts here are quite similar to the facts in *People v. Sinclair* (1998) 64 Cal.App.4th 1012 (*Sinclair*), a case that held the trial court had no duty to instruct sua sponte on the lesser included offense of voluntary manslaughter on a heat of passion or imperfect self-defense theory.  (*Id.* at 1015.)  The *Sinclair* court held the trial court was not obligated to instruct on voluntary manslaughter not just because the theories of voluntary manslaughter were inconsistent with the defense presented but because the defendant testified and completely denied under oath any participation in the charged homicide.  (*Id.* at 1019-1020.)  The same is, of course, true here.

D

To prevail on a claim of ineffective assistance of counsel, "a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-692[ ] [*Strickland*].)  To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance """"fell below an objective standard of reasonableness . . . under prevailing professional norms.""""  [Citation.]  To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's

45

deficient performance, the outcome of the proceeding would have been different. [Citations.]

"As [our Supreme Court] ha[s] observed in the past, certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding. [Citations.] The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable. [Citation.]

"Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, we have characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission. [Citation.]" (*Mickel, supra*, 2 Cal.5th at 198; see also *id*. at 198-199 ["[I]neffective assistance of counsel claims are rarely successful on direct appeal because the appellate record will often not sufficiently reveal why the defense counsel acted or failed to act on any given occasion"].)

Defendant argues his trial attorney was ineffective because he did not object when the prosecution followed improper procedure to refresh witness recollection and thereby was permitted to read hearsay testimony of witnesses Tucker, Jones, Pamela, and Goines into the record. Our Supreme Court, however, has repeatedly held that ""[d]eciding whether to object

46

is inherently tactical, and the failure to object will rarely establish ineffective assistance.'"'" (See, e.g., *People v. Arredondo* (2019) 8 Cal.5th 694, 711.)  This is not one of the rare cases where the absence of an objection establishes deficient performance.

There are various legitimate reasons why defendant's trial attorney may have opted not to object to the prosecution's method of confronting witnesses with prior testimony or statements. Counsel may have believed, particularly as to witness Tucker, that the prosecution could lay a foundation to impeach the witness with the prior testimony.  Counsel may have determined, as the prosecution affirmatively represented after the trial court inquired what hearsay exception she was relying on even though the defense was not objecting, that the prosecution would be able to establish a foundation to read prior testimony as past recollection recorded (Evid. Code, § 1237) and an objection would simply be a waste of time.  Or counsel may have desired not to call further attention to the prior testimony with an objection or may have had other strategic reasons for permitting the jury to hear aspects of the prior testimony.  These various plausible legitimate reasons for not objecting preclude reversal for ineffective assistance of counsel on this asserted ground.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 ["If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation"].)

Defendant also argues his trial attorney provided ineffective assistance because he was "underprepared."  Several

47

of the reasons defendant gives for asserting his trial attorney was underprepared, however, cannot be fully squared with the appellate record.

Defendant gives the impression that his trial attorney admitted on the record that he did not review the wiretapped calls produced by the prosecution in discovery. To the contrary, when asked directly in a hearing before opening statements whether he had listened to the wiretap calls, defense counsel replied he had.[24] In addition, defendant testified his trial attorney asked him to review numerous wiretap calls in preparation for trial too.

Defendant also suggests his trial attorney was underprepared because his production of defense discovery to the prosecution was late and, as the trial court characterized it on at least one occasion, outrageously late. Untimely production of defense discovery, however, is not a reliable indicator of a defense attorney who is unprepared and therefore ineffective. Late production of defense discovery is also consistent with a prepared attorney who makes a tactical judgment—albeit one not to be condoned—that giving the prosecution less time to prepare for defense witnesses and defense evidence is to the defense's advantage.

In a somewhat similar vein, defendant argues his trial attorney was underprepared because he did not present a

---

[24] The separate exchange with the court that defendant highlights was defense counsel's comment, before his client had testified on direct examination, that he had not combed through the hundreds of wiretap calls to flag those he would object to the prosecution using when it came time to cross-examine his client.

"coherent defense": changing his theory of the case and pursuing a third-party culpability defense only after the prosecution rested its case. Although defense counsel did tell the trial court (when confronted with prosecution objections to late defense discovery) that he decided to pursue a third-party culpability defense only after Pamela testified in the prosecution's case-in-chief, there are other indications in the record that suggest counsel planned on mounting such a defense all along but wanted to wait to reveal the strategy for as long as possible.[25] Even if not, it is not uncommon that adjustments in strategy are required as the evidence during a trial comes in. These sorts of tactical judgments are also not a reliable indication of an underprepared attorney.

As to the other indicia of underpreparedness counsel cites—the failure to timely obtain experts to contradict the prosecution's transcript and to counter the prosecution's gang

---

[25]     During Tucker's testimony (before Pamela testified), defense counsel asked Tucker if he remembered what defendant's brother's name was. The trial court sustained the prosecution's relevance objection, the defense requested a sidebar, and when the court asked defendant to explain the relevance, counsel initially demurred saying, "I will tell the court in chambers." When the court insisted on an explanation at sidebar, counsel replied only that "[defendant's] brother's name is mentioned all through this." Even before that, when the trial court first mentioned at sidebar during Phillips's testimony that it appeared the defense wanted to pursue a third-party culpability theory (the defense said it was not pursuing third-party culpability because evidence that the crime may have been a "drug deal gone bad" was just motive evidence), defense counsel did concede he "might have somebody, [he] might, identify."

49

expert—we do not believe the asserted failures were prejudicial in the *Strickland* sense even were we to assume deficient performance. The defense presented expert testimony on the issues that mattered, the DNA on the bullet and the wounds on defendant's arm, and defendant testified to what he actually said on wiretap call 260. With the defense case presented, there is no reasonable probability that an audio or linguistics expert or a defense gang expert would have produced a result more favorable to defendant.

At bottom, and in view of the appellate record we have (which reflects a successful defense motion to dismiss the jury panel during voir dire, substantial cross-examination of prosecution witnesses and demands for multiple Evidence Code section 402 hearings, and presentation of a substantial defense case), we see no basis to hold that defendant's trial attorney was underprepared to the point of being constitutionally ineffective.[26]

E

Returning to the issue of defendant's claimed statement to Detective Rozzi about the cause of his forearm wounds, defendant claims the prosecution engaged in misconduct during its rebuttal argument. Specifically, defendant complains the prosecution "in closing statement . . . pretended that no evidence existed to show [defendant] ever made a consistent statement to Detective Rozzi" even though the prosecution "was well aware of the existence of

_____

[26] Our holding that no ineffective assistance of counsel has been shown on this record encompasses the impact of the asserted instances of deficient performance both individually and cumulatively.

the official reports detailing [defendant's] explanation for the wound" and "similarly aware that search warrant affidavits by Detective Jackson had acknowledged Detective Rozzi's recitation of those very facts."[27]

This recounting of what occurred is stripped of some relevant context. When questioned by the trial court, the prosecution explained it had concerns about the accuracy of Detective Rozzi's notes such that it could not enter into a stipulation, but we do not know the nature of the concerns. We do know that the prosecution attempted, ultimately without success, to contact Detective Rozzi in response to the court's hope that a stipulation would be possible. In addition, characterizing the prosecution's argument as "pretending" no evidence existed to show defendant ever made a consistent statement to Detective Rozzi perhaps goes too far. What the prosecution said, after there had been repeated references to Detective Rozzi in the defense closing was this: "Please, all of the evidence that came in, all of the descriptions that came in, please read them back. Please have them read back. I know . . . it causes [the court reporter] work when we say 'please read it back,'" but please read

---

[27] As a result of the defense's filing of the new trial motion below, we have in the appellate record a page of notes attached as an exhibit to that motion that the defense represents are Detective Rozzi's notes of his physical inspection of defendant's body. Those notes refer to seeing only one wound on defendant's forearm (not two) and opine that wound looks like a gunshot wound. The notes also state defendant claimed he sustained that wound and another seen by Detective Rozzi as a result of a "fight." There is no reference to an ice pick or further elaboration about the claimed fight.

it back, because what comes in is the evidence from the stand, not what counsel might get up here and say, and, you know, this is what was said, or, you know, the defendant told Detective Rozzi. [¶] Who's Detective Rozzi? Did you even hear his name other than in closing? Please have it read back—"[28]

"'[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation].' [Citation.] Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.] Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.]" (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)

We do not believe the record before us demonstrates use of deceptive or reprehensible methods to persuade the jury (much less a pattern of conduct that would constitute federal constitutional error). Additionally, there is no reasonable probability defendant would have obtained a more favorable result if the prosecution had not implored the jury to read back

---

[28]     Defendant is correct when he states there *had* been a reference to Detective Rozzi before closing argument. During cross-examination, defendant testified: "The only officer I remember questioning me about any injuries on my body was [Detective] Rozzi, and he strip-searched me and questioned me about every scar that I had on my body and I responded to it."

the testimony to see if there were any references to Detective Rozzi—or even if the jury had been informed defendant told Detective Rozzi in 1987 that he sustained his forearm injury in some unspecified fight.  That sort of prior consistent statement by defendant after his arrest was still susceptible of being viewed as self-serving and would not have added much to his testimony in his own defense at trial.  Further, there was very strong evidence pointing to a gunshot as the true cause of the wound: among other things, the DNA evidence, the opinion testimony of Doctors Choi and Russell, and Andre's statement to Pamela that defendant "got shot."

F

Almost two years before defendant was sentenced, the Legislature gave trial courts discretion "in the interest of justice . . . at the time of sentencing, [to] strike or dismiss an enhancement otherwise required to be imposed by" Penal Code section 12022.5.  (Pen. Code, § 12022.5, subd. (c); Stats. 2017, ch. 682, § 2).  At sentencing, defendant did not ask the trial court to strike the Penal Code section 12022.5 enhancement the jury found true or object to its imposition.

"As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal.' [Citation.]" (*People v. Smith* (2001) 24 Cal.4th 849, 852.)  Our Supreme Court adopted this waiver rule "'to reduce the number of errors committed in the first instance' [citation], and 'the number of costly appeals brought on that basis' [citation]." (*Ibid.*)  In the sentencing context, our highest court has "applied the rule to claims of error asserted by both the People and the defendant. [Citation.]  Thus, all 'claims involving the trial court's failure to

53

properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review. [Citations.]" (*Ibid.*)

Because defendant failed to object to the Penal Code section 12022.5 enhancement or otherwise urge the trial court to exercise its discretion under Penal Code section 12022.5, subdivision (c), defendant's argument on that ground presented for the first time on appeal is forfeited.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.

54